NOTICE
This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

2020 IL App (4th) 200356-U

NO. 4-20-0356

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
November 16, 2020
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| MARK LANDERS, in His Official Capacity as Sheriff of Logan County; BRIAN VONDERHAAR, in His Official Capacity as Sheriff of Adams County; TIMOTHY BROWN, in His Official Capacity as Sheriff of Alexander County; JAMES LEITSCHUH, in His Official Capacity as Sheriff of Bond County; DAVID ERNEST, in His Official Capacity as Sheriff of Boone County; KARL H. GROESCH, in His Official Capacity as Sheriff of Brown County; RYAN KLOEPPING; in His Official Capacity as Sheriff of Carroll County; DEVRON OHRN, in His Official Capacity as Sheriff of Cass County; DUSTIN HEUERMAN, in His Official Capacity as Sheriff of Champaign County; ANDY MYERS, in His Official Capacity as Sheriff of Clay County; DOUG MAUE, in His Official Capacity as Sheriff of Clinton County; JAMES RANKIN, in His Official Capacity as Sheriff of Coles County; THOMAS J. DART, in His Official Capacity as Sheriff of Cook County; WILLIAM RUTAN, in His Official Capacity as Sheriff of Crawford County; STEVE MAROON, in His Official Capacity as Sheriff of Cumberland County; ROGER SCOTT, is His Official Capacity as Sheriff of De Kalb County; MIKE WALKER, in His Official Capacity as Sheriff of De Witt County; JOSHUA BLACKWELL, in His Official Capacity as Sheriff of Douglas County; DARBY BOEWE, in His Official Capacity as Sheriff of Edwards County; DAVID J. MAHON, in His Official Capacity as Sheriff of Effingham County; MARK DORAN, in His Official Capacity as Sheriff of Ford County; DAVID BARTONI, in His Official Capacity as Sheriff of Franklin County; JEFF STANDARD, in His Official Capacity as Sheriff of Fulton County; SHANNON BRADLEY, in His Official Capacity as Sheriff of Gallatin County; ROB McMILLEN, in His Official Capacity as Sheriff of | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Appeal from Circuit Court of Logan County No. 20MR70 |

Greene County; KEN BRINLEY, in His Official )
Capacity as Sheriff of Grundy County; DEREK )
HAGEN, in His Official Capacity as Sheriff of )
Iroquois County; JEFFREY D. BULLARD, in His )
Official Capacity as Sheriff of Jefferson County; )
MICHAL RINGHAUSEN, in His Official Capacity as )
Sheriff of Jersey County; KEVIN TURNER, in His )
Official Capacity as Sheriff of Jo Daviess County; )
MICHAEL DOWNEY, in His Official Capacity as )
Sheriff of Kankakee County; DWIGHT BAIRD, in His )
Official Capacity as Sheriff of Kendall County; JOHN )
IDLEBURG, in His Official Capacity as Sheriff of )
Lake County; TOM TEMPLETON, in His Official )
Capacity as Sheriff of La Salle County; RUSSELL )
ADAMS, in His Official Capacity as Sheriff of )
Lawrence County; JOHN SIMONTON, in His Official )
Capacity as Sheriff of Lee County; TONY )
CHILDRESS, in His Official Capacity as Sheriff of )
Livingston County; ANTONIO D. BROWN, in His )
Official Capacity as Sheriff of Macon County; )
SHAWN KAHL, in His Official Capacity as Sheriff of )
Macoupin County; JOHN D. LAKIN, in His Official )
Capacity as Sheriff of Madison County; RICH )
STEVENSON, in His Official Capacity as Sheriff of )
Marion County; CHAD KAYLOR, in His Official )
Capacity as Sheriff of Massac County; NICK )
PETITGOUT, in His Official Capacity as Sheriff of )
McDonough County; WILLIAM PRIM, in His Official )
Capacity as Sheriff of McHenry County; JON )
SANDAGE, in His Official Capacity as Sheriff of )
McLean County; MARK OLLER, in His Official )
Capacity as Sheriff of Menard County; DUSTIN )
TERRILL, in His Official Capacity as Sheriff of )
Mercer County; NEAL ROHLFING, in His Official )
Capacity as Sheriff of Monroe County; CHRIS SIMS, )
in His Official Capacity as Sheriff of Moultrie County; )
BRIAN VANVICKLE, in His Official Capacity as )
Sheriff of Ogle County; BRIAN ASBELL, in His )
Official Capacity as Sheriff of Peoria County; )
STEVEN E. BAREIS, in His Official Capacity as )
Sheriff of Perry County; DAVID HUNT, in His )
Official Capacity as Sheriff of Piatt County; DAVID )
GREENWOOD, in His Official Capacity as Sheriff of )
Pike County; RANDY KERN, in His Official Capacity )
as Sheriff of Pulaski County; SHANNON L. WOLFF, )
in His Official Capacity as Sheriff of Randolph )

County; ANDREW HIRES, in His Official Capacity as )
Sheriff of Richland County; GERALD BUSTOS, in )
His Official Capacity as Sheriff of Rock Island County; )
J. WHIPPER JOHNSON, in His Official Capacity as )
Sheriff of Saline County; JACK CAMPBELL, in His )
Official Capacity as Sheriff of Sangamon County; )
BILL REDSHAW, in His Official Capacity as Sheriff )
of Schuyler County; TOM EDDINGER, in His Official )
Capacity as Sheriff of Scott County; DAVID )
SNYDERS, in His Official Capacity as Sheriff of )
Stephenson County; JEFF LOWER, in His Official )
Capacity as Sheriff of Tazewell County; SCOTT )
HARVEL, in His Official Capacity as Sheriff of Union )
County; PAT HARTSHORN, in His Official Capacity )
as Sheriff of Vermilion County; J. DEREK MORGAN, )
in His Official Capacity as Sheriff of Wabash County; )
MARTIN EDWARDS, in His Official Capacity as )
Sheriff of Warren County; DOUG MAIER, in His )
Official Capacity as Sheriff of White County; JOHN )
BOOKER, in His Official Capacity as Sheriff of )
Whiteside County; MIKE KELLEY, in His Official )
Capacity as Sheriff of Will County; BENNIE VICK, in )
His Official Capacity as Sheriff of Williamson County; )
MATT SMITH, in His Official Capacity as Sheriff of )
Woodford County; on Behalf of Themselves and All )
Others Similarly Situated, )
              Plaintiffs-Appellees, )
              v. )
J.B. PRITZKER, in His Official Capacity as Governor )
of the State of Illinois; ROB JEFFREYS, in His )
Official Capacity as Acting Director of Corrections; )
GLEN AUSTIN, in His Official Capacity as Warden of )
Graham Correctional Center; DAVID GOMEZ, in His )
Official Capacity as Warden of Stateville Correctional )
Center; TERI KENNEDY, in Her Official Capacity as )
Warden of Logan Correctional Center; and )
ANTHONY WILLS, in His Official Capacity as ) Honorable
Warden of Menard Correctional Center, ) Jonathan C. Wright,
              Defendants-Appellants. ) Judge Presiding.

---

JUSTICE HOLDER WHITE delivered the judgment of the court.
Presiding Justice Steigmann and Justice Turner concurred in the judgment.

**ORDER**

- 3 -

¶ 1     *Held*:   The appellate court vacated the circuit court's judgment granting the preliminary injunction and remanded for further proceedings.

¶ 2     In July 2020, plaintiffs, Illinois county sheriffs, filed an amended complaint seeking a writ of *mandamus* against defendants, state officials sued in their official capacities, to compel the Illinois Department of Corrections (DOC) to accept all transfers of prisoners to its custody pursuant to several provisions of the Unified Code of Corrections (Code) (730 ILCS 5/3-2-2, 3-2-5, 3-8-1, 5-8-5, 5-8-6 (West 2018)).  Plaintiffs also filed a renewed motion for a preliminary injunction requiring defendants to accept inmates to DOC pursuant to the Code. Plaintiffs contended the Governor, through Executive Order 2020-13, lacked the discretionary authority to limit transfers of convicted offenders during a public health crisis.  Subsequently, defendants responded to plaintiffs' motions stating, in relevant part, plaintiffs failed to establish a *prima facie* case for a preliminary injunction where the Governor acted within his authority under the Illinois Emergency Management Agency Act (Act) (20 ILCS 3305/7 (West 2018)). Specifically, defendants pointed to Executive Order 2020-50, which rescinded Executive Order 2020-13 and required DOC to resume accepting transfers from county jails, subject to an intake process designed to ensure health and safety of transferees and DOC staff.

¶ 3     In August 2020, the circuit court entered a preliminary injunction requiring DOC to immediately begin accepting transfers of "all inmates" who would normally be sent to DOC pursuant to the Code, without including any protocols to prevent the spread of Coronavirus Disease 2019 (COVID-19).  Defendants filed a notice of interlocutory appeal, challenging the preliminary injunction.

¶ 4     On appeal, defendants argue (1) this court should vacate the preliminary injunction requiring DOC to accept all transfers of inmates from all county jails in Illinois without regard for the health screening measures put in place by the Governor and DOC because

(a) the circuit court committed legal error regarding the Governor's emergency powers under the Act, (b) plaintiffs failed to show that they would suffer irreparable injury without an injunction, and (c) the balance of hardships weighed heavily against the injunction and (2) in the alternative, the circuit court's statewide injunction is overbroad. We vacate and remand for further proceedings.

¶ 5                                    I. BACKGROUND

¶ 6                        A. Governor's Response to COVID-19

¶ 7           On March 9, 2020, Illinois Governor J.B. Pritzker declared the entire state of Illinois a disaster area in response to the outbreak of COVID-19, pursuant to section 7 of the Act (20 ILCS 3305/7 (West 2018)). Ill. Gubernatorial Disaster Proclamation No. 2020-38, 44 Ill. Reg. 4744 (Mar. 9, 2020). "COVID-19 is a novel severe acute respiratory illness that can spread among people through respiratory transmission and present with symptoms similar to those of influenza[.]" Ill. Gubernatorial Disaster Proclamation No. 2020-38, 44 Ill. Reg. 4744, 4745 (Mar. 9, 2020). The Governor issued subsequent proclamations extending the statewide disaster proclamation through August 23, 2020. Ill. Gubernatorial Disaster Proclamation No. 2020-59, 44 Ill. Reg. 14396 (Aug. 21, 2020).

¶ 8           On March 26, 2020, the Governor issued Executive Order 2020-13, which suspended all transfers of individuals in Illinois county jails to DOC custody, with exceptions to be developed at "the sole discretion of the Director of the [DOC]." Ill. Exec. Order No. 2020-13, 44 Ill. Reg. 5959, 5961 (Mar. 26, 2020). In Executive Order 2020-13, the Governor stated "the [DOC] currently has a population of more than 37,000 male and female inmates in 28 facilities, the vast majority of whom, because of their close proximity and contact with each other in housing units and dining halls, are especially vulnerable to contracting and spreading COVID-

- 5 -

19." Ill. Exec. Order No. 2020-13, 44 Ill. Reg. 5959, 5960 (Mar. 26, 2020). Further, "the IDOC currently has limited housing capacity to isolate and quarantine inmates who present as symptomatic of, or test positive for, COVID-19" and "inmates in county jails awaiting transfer to the IDOC facilities, because of their close proximity to and contact with each other, may be or may become symptomatic of COVID-19[.]" Ill. Exec. Order No. 2020-13, 44 Ill. Reg. 5959, 5960 (Mar. 26, 2020).

¶ 9        On July 27, 2020, the Governor issued Executive Order 2020-50, which rescinded Executive Order 2020-13. Ill. Exec. Order No. 2020-50, 44 Ill. Reg. 13143, 13146 (Jul. 27, 2020). Executive Order 2020-50 declared DOC "will resume accepting the transfer of individuals from Illinois county jails[,]" subject to an intake process designed "to ensure the health and safety of the transferring individuals, as well as all individuals and staff at [the] IDOC," which was to be devised at the discretion of the DOC Director. Ill. Exec. Order No. 2020-50, 44 Ill. Reg. 13143, 13145 (Jul. 27, 2020). That same day, DOC issued a memorandum laying out procedures for DOC to accept prisoners from county jails. The memorandum required transferees be quarantined for 14 days prior to transfer and tested for COVID-19 72 hours before the transfer. Transferees who tested positive would have their transfer to a DOC facility postponed.

¶ 10                         B. Procedural History

¶ 11        On July 24, 2020, plaintiffs filed an amended complaint seeking a writ of *mandamus* against defendants to compel DOC to accept all transfers of prisoners to its custody. Plaintiffs claimed several provisions of the Code (730 ILCS 5/1-1-1 *et seq.* (West 2018)), required DOC to accept transfers of all individuals sentenced to DOC's custody from county jails regardless of Executive Order 2020-13.

- 6 -

¶ 12        That same day, plaintiffs filed a renewed motion for a preliminary injunction requiring defendants to accept inmates to DOC pursuant to sections 3-2-2, 3-2-5, 3-8-1, 5-8-5, and 5-8-6 of the Code (730 ILCS 5/3-2-2, 3-2-5, 3-8-1, 5-8-5, 5-8-6 (West 2018)).  The motion provided that "until further order of this [c]ourt[,] [d]efendants IDOC and its respective wardens be required to accept all inmates offered for transfer by the Illinois Sheriffs pursuant to [their statutory obligation to do so]."  In support of their motion, plaintiffs argued many county jails would suffer irreparable harm without an injunction because defendants' refusal to accept inmates has resulted in county jails dangerously "nearing, reaching, or exceeding capacity."  Plaintiffs also alleged they had "a likelihood of success on the merits of their *mandamus* claim because the Governor's order violates his lawful authority and is resulting in the IDOC and its respective wardens violating their statutory obligation to accept transfer of inmates statutorily mandated to be in their custody."

¶ 13        In support of their renewed motion for a preliminary injunction, plaintiffs submitted an affidavit from McLean County Sheriff Jon Sandage.  Sandage stated that, as of July 22, 2020, McLean County jail had a maximum capacity of 297 inmates and that 228 inmates were currently being housed there.  Of those 228 inmates, 39 could have been transferred to DOC absent Executive Order 2020-13.  Sandage noted that, to prevent the spread of COVID-19, all new jail inmates were quarantined for 14 days before joining the general population.  Sandage stated that moving the 39 inmates eligible for transfer to DOC would alleviate potential crowding issues and allow the jail to transfer inmates with "behavior issues" out of the general population.

¶ 14        On July 28, 2020, defendants responded to plaintiffs' renewed motion for a preliminary injunction.  Defendants argued, in relevant part, that (1) injunctive relief was moot because DOC was going to begin accepting new inmates pursuant to Executive Order 2020-50

and DOC's safety procedures, (2) plaintiffs were unlikely to succeed on the merits because the Governor acted within his authority under the Act in issuing Executive Order 2020-50, (3) plaintiffs did not prove they would suffer irreparable injury without the injunction, and (4) the public interest weighed against an injunction because providing the requested relief would risk an outbreak of COVID-19.

¶ 15       That same day, plaintiffs submitted additional affidavits from Craig Ketelsen, Jo Daviess County Chief Deputy Sheriff, and Russell Brafford, corrections supervisor for the Monroe County Sheriff's Department, to support their renewed motion for a preliminary injunction. Both affidavits stated that on July 28, 2020, Ketelsen and Brafford spoke to staff at Menard and Statesville Correctional Centers, who told them DOC was not accepting inmates from county jails at that time.

¶ 16       Also on July 28, 2020, the circuit court held a hearing on the renewed motion for a preliminary injunction. Mark Landers, the Logan County sheriff, testified that his jail had "an operational capacity of approximately 50 [inmates]." As of July 28, 2020, the jail had 40 inmates, 15 of whom had been committed to DOC custody. Landers estimated that it cost Logan County $53.43 each day to house an inmate. Landers also testified it was not possible for his department to comply with Executive Order 2020-50 and DOC's corresponding memorandum because the jail was too small to separately quarantine 15 inmates and quarantining inmates together could lead to fights. Landers testified his staff attempted to contact DOC about transferring the 15 inmates after DOC issued its memorandum. However, Landers conceded those inmates had not been quarantined or tested. On cross examination, Landers testified he had not sought a cell-size or occupancy variance from DOC.

¶ 17        Benjamin Hollis, Chief Deputy Sheriff of Menard County, testified his jail could hold 25 male and 2 female inmates. Hollis did not know how many inmates were currently in the jail but estimated there were "five or six[.]" Hollis testified that currently the jail had "a number of open cells." However, Hollis testified the jail could not feasibly quarantine inmates because it was very small. Hollis also testified he emailed DOC about transferring two inmates on July 28, 2020, and was told DOC had not decided when it would begin accepting new inmates. Hollis acknowledged he failed to comply with DOC's memorandum before attempting to transfer the two inmates. Hollis further stated his jail was only testing inmates or checking their temperatures if they displayed COVID-19 symptoms, and he had not discussed setting up a testing program with the local health department. The court took the matter under advisement and indicated it would issue its decision on August 3, 2020.

¶ 18        On July 31, 2020, defendants filed a supplemental objection to plaintiffs' amended motion for preliminary injunction stating 12 counties requested to transfer 108 inmates to DOC custody, but none of those counties quarantined or tested those inmates. Defendants also presented a declaration from Dr. Steven Bowman, DOC's acting chief of the Office of Health Services, indicating Logan Correctional Center (an intake center for transferees) was experiencing a small outbreak of COVID-19. Dr. Bowman asserted transferring additional inmates to that facility would undermine the State's mitigation efforts by making it impossible to socially distance inmates and representing "[m]ovement between facilities makes it difficult to control infection rates." Dr. Bowman noted "COVID-19 is a highly contagious infection that can have a severe impact on a correctional institution due to the cramped quarters and number of people kept indoors in close spaces."

¶ 19 Defendants also included a declaration from the Illinois Department of Public Health's Director of Testing representing the agency worked with DOC to develop its quarantine and testing protocols and could assist county jails in testing their inmate populations to comply with Executive Order 2020-50.

¶ 20 During an August 3, 2020 hearing, the circuit court considered argument and newly issued Executive Order 2020-50. The court found plaintiffs' action was not moot despite the rescission of Executive Order 2020-13 because Executive Order 2020-50 still placed conditions on transfers and granting plaintiffs' requested relief would require defendants "to accept all felony inmate transfers without any conditions, other than those imposed by statute." Then, the court entered a preliminary injunction requiring DOC to immediately begin accepting transfers of "all inmates" who would normally be sent to DOC pursuant to the Code, without requiring the sheriffs to follow any protocols to prevent the spread of COVID-19. In ruling, the court addressed each element necessary to establish a *prima facie* case for a preliminary injunction.

¶ 21 First, the circuit court found "plaintiffs raised a fair question to a clearly ascertainable right to relief, specifically that the [DOC] must accept persons committed to it by the [c]ourts of this State for care, custody, treatment, and rehabilitation." The court found section 7(1) of the Act "does not grant the Governor authority to suspend substantive provisions of the Code." The court found the Code's directions were substantive because they imposed a "duty" on DOC "to accept properly committed offenders" and Executive Order 2020-50 purported to alter "that express substantive duty."

¶ 22 Second, the circuit court found that as a result of DOC's refusal to accept transfer of offenders due to the Governor's executive orders, plaintiffs suffered irreparable harm in the

form of nearing or exceeding capacity to house offenders and the increased risk of housing offenders at an elevated level when considered in the context of the COVID-19 pandemic. The court stated plaintiffs proved the Cook, Logan, McLean, St. Clair, Sangamon, and White County jails were "near, at, or over capacity for their inmate population" because of the Governor's executive orders. The court found this harm was exacerbated by the fact that COVID-19 is more transmissible when people are in close proximity.

¶ 23        Third, the circuit court found claims for monetary damages through the Illinois Court of Claims was not an adequate remedy at law to address the potential widespread COVID-19 issues in local county jails throughout Illinois.

¶ 24        Fourth, the circuit court found that plaintiffs had shown a likelihood of success on the merits of the complaint where DOC had a clear mandatory duty to receive persons committed to it by the courts. The court stated, "the analysis for this element is the same as the analysis of whether plaintiffs have a readily assertible [*sic*] right." The court also stated the parties agreed "the core issue in this case is one of statutory interpretation, and that statutory interpretation is the same here as it is as to whether they have raised a readily ascertainable right[.]"

¶ 25        Last, after finding plaintiffs established a *prima facie* case for a preliminary injunction, the circuit court balanced the hardships between the parties and determined the balance of hardships favored plaintiffs. Specifically, the court found "the [c]ounty [s]heriff has no options to address capacity or overpopulation in light of COVID-19. The [s]heriff must continue housing the felony-sentenced inmate until the Director [of DOC], in his sole discretion, decided to accept a transfer." The court found DOC had "options" when it received an inmate, such as releasing the inmate on parole, "provid[ing] a system of supervision[,]" or "offer[ing] diversion programs or County Impact Incarceration programs."

- 11 -

¶ 26     After the circuit court's ruling, defendants made an oral motion to stay the preliminary injunction pending appeal, but the court declined to rule on the oral motion and instead gave defendants leave to file a written motion to stay.

¶ 27     Later that same day, the circuit court memorialized its findings and preliminary injunction in a written order.  Subsequently, defendants filed a notice of interlocutory appeal, challenging the preliminary injunction.

¶ 28     On August 4, 2020, defendants filed a freestanding emergency motion for stay pending appeal in this court.  On August 5, 2020, plaintiffs filed their response to defendants' motion.

¶ 29     At a hearing on August 7, 2020, the circuit court addressed whether it had jurisdiction to rule on defendants' motion to stay and ultimately denied the motion.

¶ 30     On August 18, 2020, this court held oral arguments on defendant's motion to stay preliminary injunction.  In an August 21, 2020, corrected order, this court granted defendants' emergency motion for stay pending appeal.  This court reasoned:

> "10. Section 7(8) of the [Act], 20 ILCS 3305/7(8) (West 2018),
> provides that the [G]overnor shall have the power to 'control ***
> the movement of persons within the [disaster] area, and the
> occupancy of premises therein.'
> 11. At oral argument, this court asked plaintiffs if they had any
> argument as to why section 7(8) did not apply.  Their only
> response was that it did not apply because another portion of the
> [Act] states that nothing in the [Act] should affect the
> responsibilities of the police.  *Id.* § 3(c).  Plaintiffs made a similar

argument in their brief. However, we conclude that the limitation pertains only to active law enforcement and policing and does not extend to incidental activities such as transferring prisoners. When read in context with the remainder of § 3[(c)], 'responsibilities of police forces' refers to the core functions performed by the police, such as keeping the peace, protecting the public, and enforcing criminal laws.

12. Plaintiffs do not make any constitutional challenge to the statute, nor do plaintiffs argue the Governor is not authorized to extend the 30-day time restriction of the statute by re-declaring the entire state to be a disaster area every 30 days. 20 ILCS 3305/7 (West 2018)."

¶ 31 We now address the merits of defendants' interlocutory appeal.

¶ 32                                 II. ANALYSIS

¶ 33 On appeal, defendants argue (1) this court should vacate the preliminary injunction requiring DOC to accept all transfers of inmates from all county jails in Illinois without regard for the health screening measures put in place by the Governor and DOC because (a) the circuit court committed legal error in interpreting the Governor's emergency powers under the Act, (b) plaintiffs failed to show that they would suffer irreparable injury without an injunction, and (c) the balance of hardships weighed heavily against the injunction and (2) in the alternative, the circuit court's statewide injunction is overbroad. We vacate and remand for further proceedings.

¶ 34  " 'The grant of a preliminary injunction is an extraordinary remedy, and courts do not favor their issuance.' " *Guns Save Life, Inc. v. Raoul*, 2019 IL App (4th) 190334, ¶ 36, 146 N.E.3d 254 (quoting *Ford Motor Credit Co. v. Cornfield*, 395 Ill. App. 3d 896, 903, 918 N.E.2d 1140, 1147 (2009)).  As such, a preliminary injunction " 'should be granted only in situations of extreme emergency or where serious harm would result if the preliminary injunction was not issued.' " *World Painting Co., LLC v. Costigan,* 2012 IL App (4th) 110869, ¶ 11, 967 N.E.2d 485 (quoting *Clinton Landfill, Inc. v. Mahomet Valley Water Authority*, 406 Ill. App. 3d 374, 378, 943 N.E.2d 725, 729 (2010)).  "The party seeking injunctive relief must show it has raised a fair question about the existence of a protectable right 'and that the court should preserve the status quo until the case can be decided on the merits.' " *Guns Save Life, Inc.*, 2019 IL App (4th) 190334, ¶ 36 (quoting *Buzz Barton & Associates, Inc. v. Giannone*, 108 Ill. 2d 373, 382, 483 N.E.2d 1271, 1275 (1985)).

¶ 35  "To succeed on a motion for a preliminary injunction, a plaintiff must show '(1) a clearly ascertained right in need of protection, (2) irreparable injury in the absence of an injunction, (3) no adequate remedy at law, and (4) a likelihood of success on the merits of the case.' " *Id.* ¶ 37 (quoting *Mohanty v. St. John Heart Clinic, S.C.*, 225 Ill. 2d 52, 62, 866 N.E.2d 85, 91 (2006)).  "For each element, 'the plaintiff must raise a "fair question" that each of the elements is satisfied.' " *Id.* (quoting *Makindu v. Illinois High School Ass'n,* 2015 IL App (2d) 141201, ¶ 31, 40 N.E.3d 182).  "However, '[m]ere opinion, conclusion, or belief will not suffice.' " *Id.* (quoting *McErlean v. Harvey Area Community Organization*, 9 Ill. App. 3d 527, 529, 292 N.E.2d 479, 481 (1972)).  " 'If these elements are met, then the court must balance the hardships and consider the public interests involved.' " *Id.* (quoting *Makindu*, 2015 IL App (2d) 141201, ¶ 31).

¶ 36                                A. Standard of Review

¶ 37            "In general, we review the [circuit] court's grant or denial of a preliminary

injunction for an abuse of discretion, which occurs only when the ruling 'is arbitrary, fanciful, or

unreasonable, or when no reasonable person would adopt the court's view.' " *World Painting*

*Co., LLC*, 2012 IL App (4th) 110869, ¶ 12 (quoting *Clinton Landfill, Inc.*, 406 Ill. App. 3d at

378). "Purely legal questions arising in the preliminary-injunction analysis, however, are

reviewed *de novo*." *Id.* In this case, we find the issue of whether plaintiffs raised a fair question

of a likelihood of success on the merits dispositive. Thus, we begin our analysis there.

¶ 38            In order to determine if plaintiffs raised a fair question as to the likelihood of

success on the merits, the court must look to the underlying *mandamus* claim. To prevail on a

*mandamus* claim, "the plaintiff must establish a clear right to the requested relief, a clear duty of

the public officer to act, and clear authority of the public officer to comply with the order."

*McFatridge v. Madigan*, 2013 IL 113676, ¶ 17, 989 N.E.2d 165.

¶ 39            Plaintiffs' *mandamus* claim rested entirely on the argument the Governor lacked

statutory authority to issue the executive order, which turned on interpreting the Act and the

Code, which, as discussed above, is a legal question subject to *de novo* review. See *World*

*Painting Co., LLC*, 2012 IL App (4th) 110869, ¶ 12.

¶ 40                        B. Likelihood of Success on the Merits

¶ 41            Defendants argue plaintiffs are unlikely to succeed on the merits of their claim

because the Governor acted within his authority under the Act when he issued Executive Order

2020-50. Specifically, defendants assert the legislature granted the Governor broad discretionary

power under section 7 of the Act (20 ILCS 3305/7 (West 2018)), to protect public health and

safety in the face of a disaster, such as the COVID-19 pandemic. Plaintiffs disagree and argue

the Governor lacked authority to issue Executive Order 2020-50 under section 7(1) of the Act (20 ILCS 3305/7(1) (West 2018)), because several provisions of the Code (730 ILCS 5/3-2-2, 3-2-5, 3-8-1, 5-8-5, 5-8-6 (West 2018)) and section 3(c) of the Act (20 ILCS 3305/3(c) (West 2018)) fail to authorize the executive order.

¶ 42    We look to the statutory language to determine whether plaintiffs raised a fair question that they were likely to succeed on the merits.

¶ 43    "The fundamental rule of statutory construction is to ascertain and give effect to the legislature's intent." *Moon v. Rhode*, 2016 IL 119572, ¶ 22, 67 N.E.3d 220. "The most reliable indicator of the legislature's intent is the statutory language, which must be given its plain and ordinary meaning." *Id.* Where a statute is "clear and unambiguous, the plain language as written must be given effect without reading into it exceptions, limitations, or conditions that the legislature did not express." *Id.*

¶ 44    Section 7(1) of the Act authorizes the Governor, in the event of a disaster, "[t]o suspend the provisions of any regulatory statute prescribing procedures for conduct of State business ***." 20 ILCS 3305/7(1) (West 2018). Section 7(8) of the Act authorizes the Governor, in the event of a disaster, "[t]o control ingress and egress to and from a disaster area, the movement of persons within the area, and the occupancy of premises therein." 20 ILCS 3305/7(8) (West 2018). Section 7(12) of the Act authorizes the Governor, in the event of a disaster, to "exercise any other functions, powers, and duties as may be necessary to promote and secure the safety and protection of the civilian population." 20 ILCS 3305/7(12) (West 2018).

¶ 45    Section 3(c) of the Act limits the Governor's authority where it provides that nothing in the Act should be construed to "[a]ffect the jurisdiction or responsibilities of police

- 16 -

forces, fire fighting forces, units of the armed forces of the United States, or of any personnel thereof, when on active duty." 20 ILCS 3305/3(c) (West 2018).

¶ 46　　　Sections 3-2-2, 3-2-5, 3-8-1, 5-8-5, and 5-8-6 of the Code (730 ILCS 5/3-2-2, 3-2-5, 3-8-1, 5-8-5, 5-8-6 (West 2018)), prescribe the procedures by which prisoners are transferred from county jails to DOC custody. Section 3-2-2(1)(a) of the Code (730 ILCS 5/3-2-2(1)(a) (West 2018)), provides DOC "shall *** accept persons committed to it by the courts of this State for care, custody, treatment and rehabilitation." Section 3-2-5(a) of the Code (730 ILCS 5/3-2-5(a) (West 2018)), provides DOC "shall be responsible for all persons committed or transferred to the [DOC] under Sections 3-10-7 or 5-8-6 of this Code." Section 3-8-1(a) of the Code (730 ILCS 5/3-8-1(a) (West 2018)), provides DOC "shall establish one or more receiving stations for committed persons and for persons transferred under Section 3-10-11 and shall advise the sheriffs of the several counties of the location of such stations." Section 5-8-5 of the Code (730 ILCS 5/5-8-5 (West 2018)) provides, "A sheriff in executing an order for commitment to the [DOC] shall convey such offender to the nearest receiving station designated by the [DOC]." Section 5-8-6(a) of the Code (730 ILCS 5/5-8-6(a) (West 2018)) provides, "Offenders sentenced to a term of imprisonment for a felony shall be committed to the penitentiary system of the [DOC]."

¶ 47　　　Here, defendants argue the relevant provisions of the Code regulate the manner by which DOC conducts State business, and the Governor therefore had the authority to suspend compliance with those provisions under the plain language of the Act. Specifically, defendants argue section 7(1) of the Act explicitly allowed the Governor to "suspend the provisions of any regulatory statute prescribing procedures for conduct of State business" if compliance would in any way prevent or hinder actions necessary to cope with a disaster.

¶ 48 Moreover, defendants argue even if section 7(1) of the Act did not provide the Governor authority to issue Executive Order 2020-50, the executive order was authorized under the plain language of sections 7(8) and 7(12) of the Act. Defendants argue section 7(8) of the Act gave the Governor the authority to control the movement of prisoners and the occupancy of prisons within Illinois, the disaster area outlined in the Governor's disaster proclamation. In addition, defendants assert Section 7(12) of the Act gave the Governor the authority to issue Executive Order 2020-50, to protect the State's population as a whole by ensuring any outbreaks of COVID-19 among prisoners remained separate from the larger DOC population and DOC staff.

¶ 49 Plaintiffs argue Executive Order 2020-50 exceeded the Governor's authority under section 7(1) of the Act because the Code's transfer provisions are mandatory. Moreover, plaintiffs assert Executive Order 2020-50 effectively suspended DOC's substantive duty to accept inmate transfers, rather than the procedures by which transfers are conducted, by giving DOC's director sole discretion to accept inmates.

¶ 50 Further, plaintiffs argue the Governor was prohibited from issuing Executive Order 2020-50 by section 3(c) of the Act, which provides that nothing in the Act should be construed to "[a]ffect the jurisdiction or responsibilities of police ***." Plaintiffs assert the Code places statutory duties upon the sheriffs to perform certain tasks related to transportation of prisoners to DOC. See 730 ILCS 5/5-8-5 (West 2018). Thus, according to plaintiffs, Executive Order 2020-50 affected the responsibilities of the sheriffs.

¶ 51 Without addressing either sections 7(8) or 7(12) of the Act, the circuit court decided section 7(1) of the Act was inapplicable because the Code imposed a substantive duty on

DOC "to accept properly committed offenders" beyond simply determining the process by which those inmates are transferred.

¶ 52       Based on the plain language of the Act, we find the Governor did possess the authority to issue Executive Order 2020-50. We look to section 7(8) of the Act (20 ILCS 3305/7(8) (West 2018)), where the Governor is authorized to control "the movement of persons within the [disaster] area[.]" Based on section 7(8) of the Act, it was within the Governor's authority to require DOC to resume accepting transfers from county jails, subject to an intake process designed to ensure health and safety of transferees, the larger DOC population, and DOC staff.

¶ 53       We find the purpose of the Act is to grant the Governor broad authority to address emergencies, subject to section 3 of the Act's limited exemptions. Moreover, section 3(d) of the Act states that the Act should not be construed to "[l]imit, modify, or abridge the authority of the Governor to proclaim martial law or exercise any other powers vested in the Governor under the constitution, statutes, or common law of this State ***." 20 ILCS 3305/3(d) (West 2018). In this instance, we find noteworthy that during the pendency of this litigation in the circuit court, the Governor rescinded Executive Order 2020-13 and replaced it with Executive Order 2020-50. This latter executive order requires DOC to resume accepting inmates from county jails while giving the Director discretion to establish an intake process to monitor against the acceptance of prisoners infected with COVID-19. Although plaintiffs argue the Director still has discretion to refuse to accept inmates, we do not view that discretion to be unfettered given the language of Executive Order 2020-50. The Director's discretion is couched in terms which will require the transfers as long as the requisite 14-day quarantining process and subsequent testing has been

- 19 -

followed.  Thus, we fail to view the directives within Executive Order 2020-50 as affecting the responsibilities of the sheriffs.

¶ 54       We recognize plaintiffs argue the State is better suited with its existing facilities and resources to quarantine and test inmates than are the local county sheriffs.  However, as this court stated in our corrected order granting defendants' motion to stay, "we do not pass judgment on whether the Governor's actions are unwise or unfair, but rather on whether the Governor's actions are authorized."

¶ 55       The circuit court only looked to section 7(1) of the Act to determine the Act "does not grant the Governor authority to suspend substantive provisions of the Code."  However, we find section 7(8) of the Act granted the Governor authority to issue Executive Order 2020-50.

¶ 56       In seeking a preliminary injunction, plaintiffs were required to raise a fair question as to each element.  *Makindu*, 2015 IL App (2d) 141201, ¶ 31.  Here, a reasonable reading and interpretation of the Act would seem to vest the Governor with the authority to issue Executive Order 2020-50, and thus plaintiffs have not raised a fair question that they are likely to succeed on their *mandamus* action.  This conclusion makes any analysis regarding section 7(1) of the Act unnecessary.  We also note plaintiffs in this case have neither raised a constitutional challenge to the Act nor argued the Governor is not authorized to declare the entire state a disaster area every 30 days.  Thus, in light of plaintiffs' failure to raise a fair question as to the likelihood of success on the merits, the trial court erred in granting the preliminary injunction.

¶ 57                                    III. CONCLUSION

¶ 58       For the foregoing reasons, we vacate the circuit court's judgment granting plaintiffs' motion for a preliminary injunction and remand for further proceedings.

¶ 59       Vacated and remanded.